UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES E. ANDERSON,

        Petitioner,

        v.                                      Case No. 22-C-21

CLINTON BRYANT,

        Respondent.

**DECISION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

        In July 2014, an Outagamie County jury found Petitioner James E. Anderson guilty of attempted first-degree intentional homicide, kidnapping, intimidation of a victim, strangulation/suffocation, false imprisonment, battery with substantial risk of great bodily harm, and disorderly conduct, all as acts of domestic abuse against his then-70-year-old mother. Anderson was sentenced to ten years of initial confinement and ten years of extended supervision. He filed a postconviction motion alleging ineffective assistance of trial counsel and trial court error. The trial court denied his motion, and the Wisconsin Court of Appeals affirmed both his conviction and the order denying his motion for postconviction relief. The Wisconsin Supreme Court denied his petition for review. Anderson then filed a second motion for postconviction relief alleging ineffective assistance of appellate counsel. The trial court's order denying that motion was again affirmed by the Wisconsin Court of Appeals and his petition for review denied by the Wisconsin Supreme Court. Anderson then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this court, asserting ineffective assistance of both trial and appellate counsel in violation of his Sixth Amendment rights. For the following reasons, the petition will be denied.

# BACKGROUND

## A. Trial

The State of Wisconsin charged Anderson with attempted first-degree intentional homicide and various other acts of domestic abuse related to a 2013 attack on his mother. The evidence against Anderson consisted largely of the testimony of his mother, whom the state courts referred to using the pseudonym Cecelia in order to protect her identity. Cecelia testified that in the eighteen months before the incident, which occurred on September 14, 2013, Anderson had made threats of violence against her on "three or four" occasions. These included threatening to put her "under a lake" or into a barrel and then setting it on fire.

Cecelia testified that on the night of the incident that gave rise to the charges against Anderson, she was in her bedroom when Anderson came in unexpectedly and started choking her. He then slapped her across the face, grabbed her by the hair, and threw her onto the floor. While she was on the floor, Anderson resumed choking her and then threatened her, saying, "this is the night you die, you'll be dead by midnight." He again slapped her across the face. Anderson also broke Cecelia's cell phone so she could not call for help. At some point, Anderson told Cecelia that he was going to kill her and his father—stating that he had one bullet for each of them.

According to Cecelia, Anderson then retrieved a gun and forced Cecelia into her car. As they walked to the car, Anderson said that they were going to his father's house and that "[h]e was going to kill [them] both; . . . he was going to kill [her] fast and [his father] slow." Once the pair were in the car, Anderson forced Cecelia to start driving toward his father's house.

Feigning a heart attack along the way, Cecelia pulled into a gas station parking lot. Cecelia entered the gas station, and, after explaining the situation to the attendant, the attendant locked the

2

Case 1:22-cv-00021-WCG   Filed 08/17/23   Page 2 of 17   Document 28

doors, hid Cecelia in a utility closet, and called the police. After the police arrived, Cecelia spoke with them outside the building. Anderson had departed before the police arrived.

Anderson's version of events differed markedly from Cecelia's. He testified that on the night in question he became upset with Cecelia about an insurance payout. Cecelia claimed she did not know about the insurance money, and Anderson thought she was lying. The two continued to argue about the subject and both became agitated. Eventually, the verbal argument escalated into physical violence. Anderson and Cecelia began pushing each other. Anderson then slapped Cecelia twice across the face.

After Anderson slapped her, Cecelia told him that they would have to ask Anderson's father about the insurance money. At the time, Anderson's father was not living in the home. Anderson claims he asked Cecelia to go with him to his father's house to discuss the money. Cecelia agreed to go.

After getting ready, the pair got into Cecelia's car. Cecelia was driving, and Anderson was in the passenger seat. During the drive, Cecelia and Anderson were still bickering about the insurance money. At some point, Cecelia offered up an excuse to pull into a gas station; when Cecelia stopped the car in the gas station parking lot, both she and Anderson exited and met at the trunk. Anderson testified that he intended to help his elderly mother into the gas station, but she "angrily" told him that she was going inside and rebuffed his attempted assistance. Anderson, who is much larger than Cecelia, said he did nothing to physically restrain her. Cecelia continued into the gas station and did not come out. Anderson, who was still "[a] little bit" upset, drove home.

The jury also watched the surveillance video from the gas station and heard from the gas station attendant who was working that night, the doctor who examined Cecelia at the hospital, and the investigating officers. The gas station attendant described the events depicted in the

surveillance video. She testified that she saw Cecelia and Anderson in a car parked outside the gas station and thought it might be a domestic abuse situation. Cecelia exited the car and came into the station, stating her son had a gun and asking for help. The attendant testified that she took Cecelia to a back room, locked down the store, and called the police. By that time, the car had already left.

The investigating officers recounted their own observations of Cecelia and what she had told them. Photos of the bruises and abrasions Cecelia had sustained and of her bedroom, where the initial struggle allegedly occurred, were introduced, along with the broken cell phone. And the emergency room physician who treated Cecelia for her injuries testified that they were consistent with her account of what had happened.

During the course of the deliberations, the jury asked to see several exhibits. The circuit court allowed the exhibits that were previously published to the jury to be sent to the jury room but denied the jury's request to again watch the surveillance video from the gas station. The judge expressed concern about the logistical difficulties of displaying the video, interrupting deliberations, and the risk of having the jury unduly focus on certain portions of exhibits. He therefore denied the request and instructed the jurors that they would have to rely on their collective memory of the surveillance video footage. After resuming deliberations, the jury found Anderson guilty of attempted first-degree intentional homicide, kidnapping, intimidation of a victim, strangulation/suffocation, false imprisonment, battery with substantial risk of great bodily harm, and disorderly conduct.

**B. Postconviction Proceedings**

Anderson filed a motion for postconviction relief pursuant to Wis. Stat. 974.04, alleging that his trial counsel was constitutionally ineffective in two respects. First, he claimed that trial

4

counsel was ineffective for failing to object to the testimony of the investigation officers on improper vouching grounds.  Second, he claimed trial counsel performed deficiently by failing to call a medical expert to counter the testimony of the State's expert regarding Cecelia's injuries.  The circuit court held an evidentiary hearing and denied both claims.  The Wisconsin Court of Appeals affirmed, and the Wisconsin Supreme Court denied review.  *See* Dkt. Nos. 1-2 & 1-3.

Anderson then filed a second motion for postconviction relief in the circuit court, under Wis. Stat. § 974.06, alleging that his postconviction/appellate counsel was ineffective for failing to raise two additional issues: the sufficiency of the evidence for the attempted first-degree intentional homicide charge and the trial court's discretionary decision denying the jury's request to view the surveillance video. Dkt. No. 1-4 at 5, ¶ 10.  The circuit court held another evidentiary hearing at which appellate counsel testified that she "always consider[s]" raising sufficiency-of-the-evidence claims but that, in this case, she "did not consider" it to be "a viable issue" because "if you believed everything [Cecelia] said . . . there was not a sufficiency issue." *Id.* at 13:19–14:6 & 18:15–17; *see also* Dkt. No. 1-4 at 5, ¶ 11.  Appellate counsel further testified that she knew the circuit court's decision not to allow the jury to review the surveillance video footage was a discretionary one and that she did not think it was an issue worth pursuing.  Transcript of Postconviction Relief (*Machner*) Hearing (November 22, 2019) at 14:18–15:2, Dkt. No. 14-28; *see also* Dkt. No. 1-4 at 5–6, ¶ 11.

The circuit court rejected both claims on the merits.  It concluded that there was sufficient evidence to sustain the attempted homicide count and that its decision refusing the jury's request to view the video during its deliberations was reasonable and, even if error, was harmless.  The Wisconsin Court of Appeals again affirmed, and the Wisconsin Supreme Court denied Anderson's petition for postconviction review.  Dkt. Nos. 1-4 & 1-5.

5

Thereafter, Anderson filed his petition for a writ of habeas corpus under 28 U.S.C. § 2254 in this court, asserting the same grounds he had asserted in his two motions for postconviction relief. He has apparently abandoned his claims of ineffective assistance of trial counsel, however. In his brief in support of his § 2254 petition, he argues only that his appellate counsel was constitutionally ineffective for failing to raise two challenges to his conviction, namely, that the evidence adduced at trial was insufficient to convict him of attempted first-degree homicide and that the circuit court erred when it refused to provide the deliberating jury with the video footage of Anderson and Cecelia's interaction at the gas station.

## ANALYSIS

### A. Standard or Review

Anderson's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254. Under AEDPA, a federal court may grant habeas relief only if a state court's decision "on the merits" was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2); *see also Woods v. Donald*, 575 U.S. 312, 315–16 (2015); *Connor v. McBride*, 375 F.3d 643, 648–49 (7th Cir. 2004). The relevant state court decision is that of the last state court to address the claim, which here is from the Wisconsin Court of Appeals. *Powell v. Fuchs*, 4 F.4th 541, 547 (7th Cir. 2021), *reh'g denied* (Sept. 10, 2021) (citing *Cal v. Garnett,* 991 F.3d 843, 848 (7th Cir. 2021)).

A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule, or, in applying the proper legal rule, it reached the opposite result as the Supreme Court on "materially indistinguishable" facts. *Brown v. Payton*, 544 U.S. 133, 141

(2005). A state court decision is an "unreasonable application of . . . clearly established Federal law" when the court applied Supreme Court precedent in "an objectively unreasonable manner." *Id.* The determination of factual issues made by a state court is presumed to be correct, though that presumption can be overcome by presentation of clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The standard set forth under Section 2254(d) "means that on habeas review, federal courts are usually limited to a deferential review of the reasonableness, rather than the absolute correctness, of a state court decision." *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012) (citation omitted). This standard is, and was meant to be, an "intentionally" difficult one to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103); *see also Davis v. Ayala*, 576 U.S. 257, 269–70 (2015).

Anderson claims he is entitled to relief under § 2254 because his appellate counsel provided ineffective assistance by failing to challenge (1) the sufficiency of the evidence underlying the attempted first-degree intentional homicide charge and (2) the circuit court's discretionary decision to not replay the gas station surveillance video footage for the jury. Claims of ineffective assistance of trial counsel are governed by well-established law set forth by the United States

7

Case 1:22-cv-00021-WCG    Filed 08/17/23    Page 7 of 17    Document 28

Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Claims concerning the performance of appellate counsel are judged by the same standard. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535–36 (1986) (applying *Strickland* to claim of attorney error on appeal)).

Under *Strickland*, the petitioner must show that (1) "counsel's performance was deficient," and such deficient performance (2) "prejudiced the defense." *Strickland*, 466 U.S. at 687. A petitioner satisfies the first prong if he demonstrates that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To satisfy the second prong, it is not enough for a petitioner to show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The deficient-performance prong need not be addressed before the prejudice prong. *Robbins*, 528 U.S. at 286 n.14 (quoting *Strickland*, 466 U.S. at 697) ("'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'"); *see also Felton v. Bartow*, 926 F.3d 451, 463–64 (7th Cir. 2019).

On direct review, "[j]udicial scrutiny of counsel's performance is highly deferential." *Strickland*, 466 U.S. at 689. This is because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* When applied in tandem with § 2254, "review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). "When § 2254(d) applies, the question

8

is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* In short, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. Relief can be granted under § 2254 only if there are no "arguments that would otherwise justify the state court's result" when evaluated against the Supreme Court's precedents. *Id.*

As an initial matter, Anderson contends that, because the Wisconsin Court of Appeals' decision was "contrary to" federal law, this court should review its decision *de novo*, not under the doubly deferential AEDPA-and-*Strickland* standard. Specifically, Anderson's maintains that the Wisconsin Supreme Court has improperly "imposed an additional requirement to the deficiency inquiry" that has not been approved by the Supreme Court in state cases such as Anderson's. Br. in Supp. of Pet. for a Writ of Habeas Corpus at 11–14, Dkt. No. 17. In support of this argument, Anderson cites the court's decision in *Walker v. Pollard*, No. 18-C-0147, 2019 WL 4219429, at *15–16 (E.D. Wis. Sept. 4, 2019), which noted that the Wisconsin Supreme Court appears to have added a third element to the *Strickland* test for ineffective assistance of appellate counsel claims in *State v. Starks*, 2013 WI 69, 349 Wis. 2d 274, 833 N.W.2d 146. In *Starks*, the court held that "a defendant who argues in a habeas petition that he received ineffective assistance of appellate counsel because certain arguments were not raised must demonstrate that the claims he believes should have been raised on appeal were 'clearly stronger' than the claims that were raised." *Id.* at ¶ 6. Writing in *Walker*, Judge Adelman stated that in so ruling, the Wisconsin Supreme Court's addition of this element to the *Strickland* test "was contrary to clearly established Supreme Court law." 2019 WL 4219429, at *15. Anderson argues that because the Wisconsin courts applied the wrong standard, this court's review under § 2254 should be *de novo*.

9

There is some merit to Judge Adelman's view that, to the extent it has added the "clearly stronger" element to the *Strickland* test for ineffective assistance of postconviction/appellate counsel claims, the Wisconsin Supreme Court seems to have misread the United States Supreme Court's decision in *Robbins*, on which *Stark* primarily relies. *Robbins* dealt with the question of how ineffective assistance of appellate counsel is shown when appellate counsel files a no-merit brief under *Anders v. California*, 386 U.S. 738 (1967), as opposed to a merits brief raising specific issues. The Court noted that in *Jones v. Barnes*, 463 U.S. 745 (1983), it had "held that appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Robbins*, 528 U.S. at 288. As a result, the Court observed in *Robbins* that while it was still possible to show deficient performance based on counsel's failure to raise a particular claim in such cases, it was more difficult than when counsel filed a no-merit brief. This is because to show deficient performance a petitioner whose appellate attorney filed a no-merit brief only has to show that a reasonably competent attorney would have found at least one non-frivolous issue warranting a merits brief, whereas a petitioner whose appellate counsel filed a merits brief would generally need to show that the issues counsel did not raise were "clearly stronger" than those that were presented. *Id.*

In making this observation, however, the Court was not changing the test for ineffective assistance of counsel claims. To the contrary, the Court explicitly stated in *Robbins* that "the proper standard for evaluating Robbins' claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington* . . . ." *Id.* at 285. While one would expect counsel to focus on the strongest claims first, it does not follow from the fact that a claim was not asserted by previous counsel that it has no merit. And the very fact that previously asserted claims failed

10

would suggest that, at least in the view of the petitioner, the unasserted claim is stronger. Ultimately, there is no way to determine which claims are stronger short of assessing their merits. It is thus unclear what such an element would add to the *Strickland* test for ineffective assistance of counsel. Where appellate counsel fails to assert a meritorious claim, it would appear the first prong of *Strickland* is met, regardless of the strength of any previous claims that may have been asserted.

Ultimately, however, the court does not need to decide whether Anderson is correct that the Wisconsin Supreme Court has added a component to the *Strickland* test for ineffective assistance of counsel. The court need not decide this question for the simple reason that the court of appeals properly applied *Strickland* in its decision rejecting Anderson's claims for ineffective assistance of appellate counsel. It is true that the court of appeals stated that "[w]hen the defendant is challenging appellate counsel's failure to raise a particular claim, the defendant must also show that the claim 'was clearly stronger than issues that counsel did present.'" Dkt. No. 1-4 at ¶ 17. But the court did not reject Anderson's claims because they did not meet that alleged additional element of the standard. Nor did the state court hold that Anderson procedurally defaulted his ineffective assistance of appellate counsel claims because he failed to show that they were clearly stronger than the claims that were raised in the previous postconviction motion. *See, e.g.*, *Garcia v. Cromwell*, 28 F.4th 764, 773 (7th Cir. 2022).

Instead, the court held that both Anderson's claim that the evidence was insufficient to support his conviction for attempted murder and his claim that the trial court erred in denying the jury's request to view the gas station surveillance video failed on their merits. Because neither claim had merit, the court of appeals logically concluded that the performance of Anderson's appellate counsel could not have been deficient in failing to assert them. An attorney does not

11

provide ineffective assistance to his client by failing to assert meritless claims. Accordingly, since the court of appeals applied the correct federal law, the "doubly deferential" standard of review applies. With that standard in mind, the court will proceed to address Anderson's claims under § 2254.

### B. Sufficiency of the Evidence for Attempted First-Degree Intentional Homicide

Anderson claims that his appellate counsel was constitutionally ineffective in failing to challenge the sufficiency of the evidence to support his conviction for Attempted First-Degree Intentional Homicide. He contends that the evidence presented at trial was legally insufficient to support the jury's finding beyond a reasonable doubt that he was guilty of that offense as defined by Wisconsin law. Because his appellate attorney failed to raise this argument on direct appeal of his conviction, Anderson claims his attorney's representation was deficient under *Strickland* and he is entitled to relief under § 2254.

The constitutional standard for sufficiency of the evidence was set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). There, the Court held that "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324. In rejecting Anderson's claim, the Wisconsin Court of Appeals applied this test. Dkt. No. 1-4, ¶ 19 (quoting *State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990)). The court concluded that the evidence was sufficient to support his conviction and thus his attorney was not constitutionally ineffective in failing to raise the issue on direct appeal. The question before this court is whether the State court's decision constitutes an unreasonable application of this test.

12

Case 1:22-cv-00021-WCG   Filed 08/17/23   Page 12 of 17   Document 28

The criminal code of Wisconsin sets out the requirements for the crime of attempt as follows:

> An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that the actor does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that the actor formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor.

Wis. Stat. § 939.32(3). Anderson argues that the Wisconsin courts have adopted the "stop the film" test to determine whether a defendant's acts have proceeded far enough to constitute the crime of attempt. The source of the so-called "stop the film" test is a footnote in *Hamiel v. State*, 285 N.W.2d 639 (Wis. 1992), recounting how one commentator had put the test:

> If the example may be permitted, it is as though a cinematograph film, which has so far depicted merely, the accused person's acts without stating what was his intention, had been suddenly stopped, and the audience were asked to say to what end those acts were directed. If there is only one reasonable answer to this question then the accused has done what amounts to an "attempt" to attain that end. If there is more than one reasonably possible answer, then the accused has not yet done enough.

*Id.* at 645 n.4 (quoting J.W.C. Turner, *Attempts to Commit Crimes*, 5 CAMBRIDGE L.J. 120, 237–38 (1934)). Applying that test to the facts of his case, Anderson argues that "the film stopped at the time Cecelia entered the gas station, and it is clear that the State did not present sufficient evidence that the only possible outcome, absent her entering the gas station, was Anderson killing her." Dkt. No. 17 at 17. It is entirely reasonable, Anderson contends, that he would not have killed her, given that he had plenty of opportunity earlier, he did not stop her from leaving the car and entering the gas station, and he left the area before she went inside. Since a reasonable outcome at the point the film stopped—in fact, the actual outcome—is that he would not have killed his mother, Anderson contends the evidence was legally insufficient.

Considered in light of the plain language of the statute, Anderson's argument is not unreasonable. Respondent argues that the crime of attempted first-degree intentional homicide "had already been completed when Cecilia took refuge in the gas station." Dkt. No. 24 at 2. But if this is true, why was Cecilia still alive? If Anderson had the intent to kill Cecilia before she took refuge in the gas station, why didn't he? Why didn't he do it in the privacy of their home? Why did he let her out of the car when she feigned a heart attack? If he really wanted her dead, why did he care if she was having a heart attack? The word "unequivocally" means "in an unequivocal manner," and the definition of "unequivocal" is "leaving no doubt." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2494 (G. & C. Merriam Company 1967). What are the acts that show "*unequivocally, under all the circumstances*," that Anderson formed the intent and would have committed the crime except for the intervention of another person and some other extraneous factor? Who was the intervenor or what was the extraneous factor that prevented him from completing the crime?

Whatever a commentator may have said about the analogy between a movie and the crime of attempt, however, the "stop the film" test is not the standard Wisconsin Supreme Court has adopted for deciding whether an attempt has occurred. In what is perhaps the State's leading case on the crime of attempt, the Wisconsin Supreme Court construed its attempt statute as follows:

> We interpret sec. 939.32(3) as follows: to prove attempt, the state must prove an intent to commit a specific crime accompanied by sufficient acts to demonstrate unequivocally that it was improbable the accused would desist of his or her own free will. The intervention of another person or some other extraneous factor that prevents the accused from completing the crime is not an element of the crime of attempt. If the individual, acting with the requisite intent, commits sufficient acts to constitute an attempt, voluntary abandonment of the crime after that point is not a defense.

*State v. Stewart*, 143 Wis. 2d 28, 31, 420 N.W.2d 44 (1988). This court is bound by the Wisconsin Supreme Court's interpretation of a Wisconsin statute. *See Bradshaw v. Richey*, 546 U.S. 74, 76

14

(2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Under this construction of the statute, the crime of attempt becomes a matter of ascertaining the intent of the accused at a point prior to the time he might have changed his mind and voluntarily abandoned any such intent. A plan to commit a crime may be enough to convict for an attempt if the jury concludes that the acts taken in furtherance of the plan establish that "it was improbable the accused would desist of his or her own free will." *Stewart*, 143 Wis. 2d at 31.

In this case, the evidence was constitutionally sufficient to support the jury's verdict. Applying the test for the crime of attempt adopted by the Wisconsin Supreme Court in *Stewart* under the deferential standard of § 2254, the court cannot say that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324. As the court of appeals noted, "[t]he crime of attempt required the State to prove only that Anderson intended to kill Cecelia before she escaped and he had performed sufficient acts in furtherance of that crime." Dkt. No. 1-4 ¶ 24 (citing *Stewart*, 143 Wis. 2d at 40). "Under Wis. Stat. § 939.32(3)," the court held, "Anderson's conduct must have passed the point 'where most men [or women], holding such an intention as the defendant holds, would think better of their conduct and desist.'" *Id.* (quoting *Stewart*, 143 Wis. 2d at 40). Cecelia testified that Anderson not only physically attacked her and told her he intended to kill her, but he forced her into her car at gunpoint and had her drive to his father's house where he said he would kill her quickly and his father slowly. A reasonable jury could conclude that this was past the point where most men, holding such an intention, would think

15

better of their conduct and desist.  Since that is all that Wisconsin law requires, Anderson's claim that the evidence was insufficient fails.

### B. Jury's Access to the Video Footage During Its Deliberations

Anderson's second claim for habeas relief is that the trial court erroneously exercised its discretion under Wisconsin law by refusing to show the jury the gas station surveillance video during its deliberations, and appellate counsel's failure to raise this issue amounts to ineffective assistance under *Strickland*.  This claim fails for the same reason Anderson's other ineffective assistance of counsel claim failed: there is no merit to the claim his postconviction counsel failed to assert.  We know this because, just as with the previous claim, the Wisconsin Court of Appeals told us so.  Applying Wisconsin law, the Court of Appeals held that the trial court had appropriately exercised its discretion in denying the jury's request to again view the gas station surveillance video during deliberations.  Dkt. No. 1-4 at ¶ 33.  Again, this court has no authority to overturn a state court's resolution of an issue of state law on § 2254 habeas review.  *Harper v. Brown*, 865 F.3d 857, 861 (7th Cir. 2017).  The Court of Appeals also determined that, even if the trial court had erroneously exercised its discretion in denying the jury's request, Anderson could not show that the error was prejudicial.  Dkt. No. 1-4 at ¶ 34.  The Court of Appeal's determination of this issue is likewise sound and thus is not contrary to or an unreasonable application of federal law.

### CONCLUSION

For the foregoing reasons, Anderson's petition for writ of habeas corpus (Dkt. No. 1) is **DENIED**.  The Clerk is directed to enter judgment dismissing the case.  A certificate of appealability will be **DENIED**.  I do not believe that reasonable jurists would believe that Anderson has made a substantial showing of the denial of a constitutional right.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Anderson is advised that the judgment entered by the Clerk is final. A dissatisfied party may appeal this court's decision to the United States Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4. In the event Anderson decides to appeal, he should also request that the court of appeals issue a certificate of appealability. Fed. R. App. P. 22(b).

**SO ORDERED** at Green Bay, Wisconsin this 17th day of August, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge